UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

MARIE REYMORE,               )
                                       )
             Plaintiff,      )
                                       )
         vs.              )      No. 1:16-cv-00102-SEB-DML
                                       )
MARIAN UNIVERSITY,       )
                                       )
             Defendant.    )

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

This cause is before the Court on Defendant's Motion for Summary Judgment [Docket No. 45], filed on January 13, 2017. Plaintiff Marie Reymore has brought this action against her former employer, Marian University, alleging that it discriminated against her because of her gender and retaliated against her for filing a charge with the Equal Employment Opportunity Commission ("EEOC"), all in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"). For the reasons detailed in this entry, we <u>GRANT</u> Defendant's Motion for Summary Judgment.

## <u>Factual Background</u>

### I.    **Reymore's Employment at Marian University**

In 2000, Marian University ("Marian") hired Dr. Marie Reymore ("Reymore"), who had earned her Master's degree in economics in 1994 and her Ph.D. in economics in 1999, to serve as a full-time Assistant Professor of Economics in its Business Department (the predecessor to its Business School). In that capacity, she taught four classes each

semester, developed the economics course curriculum, and supervised up to 120 students each year.

Following a 2007 restructuring of the Marian Business Department to make it a part of the Business School, Reymore served as the Business School's interim dean until 2010. Reymore was approved for tenure in 2008 and became an Associate Professor of Economics.[1] In 2009, Reymore began teaching Marian Adult Program ("MAP") courses, an accelerated degree completion program geared toward working professionals. MAP courses were typically taught by adjunct instructors on a single-course basis. As a part of that program, Reymore taught Statistical Methods, Introductory Economics, and Nursing Economics and contracted with Marian to continue teaching such courses every semester. This arrangement continued until Marian decided to discontinue it for the reason(s) discussed below.

In 2010, Marian hired Dr. Russell Kershaw to serve as Dean of the School of Business. During her term as interim dean, Marian's Vice President and Provost, Dr. Thomas Enneking, had authorized Reymore to hire only a part-time administrative assistant, even though she had requested full-time support. Reymore became upset when, in 2011, Dean Kershaw, a male, was authorized to hire a full-time assistant. Docket No. 23 (Am. Compl.) at 2. This decision was allegedly made for budgetary reasons and Provost Enneking's approval of Kershaw's request to hire a full-time assistant was

---

[1] Marian University's Faculty Handbook provides that "academic tenure is awarded to those faculty members who have served a probationary period and whose overall record of performance in teaching, research and service has been examined and found exemplary and serving of continuous employment." Docket No. 53-3 at 13.

conditioned on the assistant's providing support to another dean in addition to Kershaw. Docket No. 47-6 (Enneking Aff.) at para. 17. Reymore acknowledges that Marian's receipt of a significant financial gift in 2010 from a donor to the University enabled the funding of a full-time assistant. Docket No. 47-1 (Reymore Dep.) at 124:9-25.

While serving as Dean of Marian's Business School Dean in 2010, Kershaw decided to move the University's economics program from the Business School to the School of Liberal Arts. Reymore agreed to teach economics courses within the School of Liberal Arts and was thus transferred to that department. Her new supervisor became the Liberal Arts School's Dean, James Norton. As of Fall 2012, Reymore was the only full-time faculty member teaching economics in the Liberal Arts School.

Following the transfer of the Economics Department, Professor James Polito, who also taught economics, remained assigned to the Business School under Dean Kershaw's Supervision.[2] Polito became a tenured professor of economics in 2012 and his course load included economics, undergraduate business, and finance classes.

Reymore served as a full-time faculty member until the end of the Spring 2015 semester, when Marian decided not to renew her contract. We address the details leading up to that decision below.

---

[2] In 2008, Marian had hired Professor James Polito to be a full-time faculty member in its Business School's Economics Department. Dr. Reymore had interviewed Dr. Polito while she was Dean of Marian's Business School, and recommended his hiring, in part based on his decade of experience in a non-academic setting.

## II.     The Termination of Reymore's Full-Time Faculty Contract

Prior to 2014, Marian had compiled data concerning low student enrollments in certain areas of study, including economics, art history, photography, and French, and developed a proposal to eliminate these subjects from its major and/or minor tracks course offerings. With regard to the economics courses, for example, the statistics showed that, between 2007 and 2014, only three or fewer students were enrolled with minors in that subject area. Enneking decided sometime in 2014 to drop the economics program from the curriculum. Enneking Aff. at para. 3. Marian's administration agreed to eliminate the economics program (both the major and minor), as well as majors in art history, photography, and French. Dropping the minors in those subjects was not recommended because student enrollments were sufficient to warrant their continuation and because the faculty members assigned to teach those subjects also taught other courses and programs. Docket No. 47-5 (Enneking Dep.) at 96:23-97:10; Docket No. 47-4 (William Harting Aff.) at para. 6. The teaching contracts covering courses in economics did not require the faculty to support other programs. Harting Aff. at para. 7.

Thereafter, Marian's Academic Policies Committee ("APC") began consideration of the elimination of the Economics program as well as certain other majors in other subjects. According to Marian's Faculty Handbook, the APC is charged with the responsibility for changes to academic programs for review by the faculty. (Reymore herself had served as a member of the APC). The APC ultimately voted in favor of the elimination of the major due to low enrollment as well as the French major. Reymore

Dep. at 201:12-204:6. Marian's Board of Trustees approved the proposal, and the decision became effective as of May 8, 2015.

Reymore was notified in February 2015 that her full-time faculty contract would be terminated based on the decision by the Board of Trustees to eliminate the economics major and minors, cancelling the need for a full-time faculty member to teach that subject. On June 29, 2015, Enneking personally informed Reymore that he had decided not to renew her full-time faculty contract given the continued low enrollments in Marian's Economics courses and low graduation rates. Marian contends in this litigation that Enneking "could have pursued the termination of Reymore's full-time faculty contract for cause based on her performance" (discussed below) "but he decided to instead pursue deletion of the Economics program due to insufficient enrollment, which had the same result, did not require Marian to engage in the difficult and time-consuming process of terminating a tenured faculty member for cause, and would relieve Reymore from having to tell prospective employers that she had been terminated for poor performance." Def.'s Br. at 10; Reymore Dep. 247:1-10. Following Enneking's conference with Reymore in which he informed her that her contract was being terminated, she inquired whether she could continue to teach MAP courses. Enneking responded that she could continue, so long as her teaching services were needed and she also performed well. Reymore Dep. at 247:1-10.

## III. Reymore's Performance Evaluations

### A. Expectations of Faculty

Marian's Faculty Handbook outlines performance expectations for faculty

members, including teaching effectiveness, availability to students, and compliance with administrative deadlines. Reymore admits that these standards applied to her, both in her capacity as a full-time faculty member and as a MAP course instructor.

### B. Reymore's Full-time Economics Professor Evaluations

Reymore's performance reviews as a full-time faculty member during her time at Marian have generated contradictory assessments between the parties to this litigation. Reymore asserts that in 2001 she received a satisfactory performance evaluation and that in 2008 and 2009, Enneking wrote positive reference letters for her, which, she contends, he would not have done had her performance been poor. Enneking Dept. at 42. Regarding student evaluations between the fall semester of 2014 and the spring semester of 2015, Reymore describes them as referencing valuable aspects of her courses and reflecting a high level of agreement as to the quality of her teaching performance. Reymore Aff. at para. 21-35. Reymore also contends that she never received any negative feedback regarding her performance as a teacher from anyone within the Marian administration prior to her termination. Reymore Aff. at para. 10.

Marian holds a different opinion regarding the quality of Reymore's performance, noting that Enneking "began to notice a decline in [Reymore's] performance" following her successful tenure bid in 2008. Enneking Dep. at 43:19-23; 65:12-66:6. Sometime in May 2008, Marian's then-Dean of Academic Affairs, William Harting, met with students who complained that Reymore had missed approximately ten classes during the semester, was habitually late for class, and in fact was an hour late the day of the final examination. Harting Aff. at para. 4. Reymore reportedly failed to return the final tests and rough drafts

of papers to the students, even though she had imposed accelerated deadlines to complete their final papers. *Id.* In general, the students were critical of Reymore's teaching style and performance. *Id.* Apart from sharing these comments with Reymore, Marian does not appear to have done any follow up aimed at improving her performance.

Not until 2011 did Marian officially evaluate Reymore's performance, when Kershaw concluded that Reymore's teaching methods were not satisfactory. In response to this evaluation, Reymore allegedly committed to make improvements. Reymore Dep. 235:16-236:2. In 2013, two years later, Dean Norton informed Enneking that he had received a complaint from an undergraduate student about her performance in an online course. Enneking Aff. at para. 9. The student reported that Reymore was disorganized and tardy in posting assignments; she routinely changed due dates for student assignments and failed to grade past assignments. *Id.* She also failed to respond to students' questions. *Id.* Norton conveyed these concerns to Reymore, but despite some minor improvements, her poor communication practices and disorganization continued. *Id.* Prompted by these complaints, Enneking and Norton met with Reymore in 2013 to discuss her unsatisfactory teaching performance. Reymore Dep. at 232:24-234:14. Prior to and in preparation for the meeting, Enneking undertook a review of past student evaluations relating to Reymore's courses, noting in particular the following:

- Spring 2008 courses, which indicated that Reymore was absent multiple times and habitually tardy, that she delayed returning homework and tests and was difficult to meet with outside of class;
- Fall 2010, which showed that Dr. Reymore cancelled multiple classes, failed to timely return homework and tests and exhibited a lack of preparation, focus, and interest in teaching; and

- Spring 2010, which recounted her frequent absences, tardiness, untimely returning of class work, and described her as disorganized, unresponsive, and uncaring.
- Fall 2011, which reflected students' dissatisfaction with Reymore's absences from class and office hours, tardiness, untimely returning of class work, and her unresponsiveness; and
- Spring 2012 and 2013, which students reported a continuation of the same types of complaints.

Enneking Aff. at para 12. During the 2013 meeting, Enneking reviewed this information with Reymore. In addition, two Marian administrators discussed with Reymore her tardiness in complying with administrative deadlines, i.e., in submitting book orders, class rosters, and grades. Following this meeting, Enneking monitored Reymore's performance via student evaluations, including their reviews of courses Reymore taught as part of the MAP Program.

### C. Reymore's MAP Course Evaluations

Marian administrators never specifically evaluated Reymore's performance in teaching the MAP course. The only evaluations Reymore received in the MAP program were from students. In reviewing the evaluations of Reymore's MAP courses, Enneking discovered that the students' evaluations were similar to those for courses she had taught with full-time students. One student commented in an evaluation for a 2014 Fall semester MAP course that Reymore had failed to timely return assignments and tests, was not responsive to student inquiries, and was disorganized and rude.

Lesley Neff, Marian's Director of Educational Services for the MAP Program, initially was satisfied with Reymore's performance. Soon, however, she began to notice a decline in Reymore's work ethic, passion, and energy during the final two years of her employment. Docket No. 47-8 (Neff Dep.) at 7:20-22; 35; 23-36-36:25. In December

2014, a MAP student sent an email to Neff expressing concern that the students in that course had not been informed by Reymore regarding the subjects that would be covered on their next test and that he/she had tried several times to contact Reymore to no avail. Docket No. 47-9 (Neff Aff.) at para. 4. Reymore reportedly had not returned the last assignments and tests to this student and her classmates, which was particularly problematic for MAP students who had to balance their schedules of classes with their jobs. *Id*. Neff further noticed that during the same time period Reymore's compliance with MAP-related administrative deadlines was deficient. Neff Dep. at 36:19-21. Reymore has admitted that she sometimes submitted grades past the deadlines for certain of the MAP courses she taught between the Spring 2014 and Fall 2015 semesters. Docket no. 52-1 (Reymore Aff.) at 3-4.

Enneking continued to monitor Reymore's performance in teaching the MAP courses. Enneking Aff. at para. 14. After receiving students' evaluations for her 2015 Summer semester courses, he again noted complaints about her being disorganized and failing to timely return homework and tests. Enneking Aff. at para. 12. In checking Reymore's compliance with MAP deadlines, he discovered that she continued to miss the deadlines to submit grades. Enneking Aff. at para. 14.

Accordingly, in August or September 2015, after concluding that Reymore was no longer performing well in teaching MAP courses, Enneking instructed Neff, who had responsibility for executing MAP contracts, to discontinue the MAP courses which Reymore had been teaching. Enneking Aff. at para. 14; Enneking Dep. at 54:1-55:20. Neff informed Enneking that she had already offered Reymore teaching assignments

through the end of 2015, and that Neff preferred to honor her commitment. Neff. Aff. at para. 7. Enneking agreed (Enneking Dep. at 54:16-23); Neff, however, did not try to persuade Enneking to continue Reymore as a MAP teacher. Neff Dep. at 98:16-22. In the latter part of 2015, Enneking again reviewed student evaluations from MAP courses that Reymore had taught which revealed complaints as to Reymore's tardiness. Enneking Aff. at para. 15.

## IV.    Marian's Termination of its Contracts with Reymore for MAP Course Instruction

In the Spring of 2015, Neff asked Reymore to perform a textbook revision, and in March 2015, Enneking signed a $250 contract with Reymore for this service. He viewed the textbook revision as a minor task and appropriate for an instructor who was teaching the course for which the revision was required.

In December 2015, Reymore was informed that her contracts to teach MAP Statistical Methods and Introductory Economics would not be renewed. Reymore asserts, and Marian does not dispute, that Enneking gave her varying reasons for not renewing her contracts.  On January 8, 2016, Enneking told her that he was unaware of any specific reason for the non-renewal of her MAP course contracts. Nine months later, on September 12, 2016, Enneking told her he believed that she was not an effective or engaging teacher and that in his view MAP instructors should have experience outside academia, which Reymore lacked. As of November 16, 2016, according to Enneking, the University had decided to discontinue its relationship with Reymore as a MAP instructor because of her history of poor performance teaching MAP courses.

In response to the reports regarding Reymore's poor teaching performance, Ms. Neff enlisted other adjunct instructors who were on staff whom she believed were well-suited to teach the courses Reymore had previously taught. Laura Moore was hired to teach Statistical Methods course because she had previously taught this course. Michael Jensen, who had previously been approved by Reymore as an instructor for the Economics MAP course, was available to take over teaching that class.

In late December 2015, Reymore inquired of Enneking regarding the reason for the discontinuation of her MAP contracts; Enneking responded that he did not know the reason. Enneking Dep. at 28:19-29:5. This reply was untruthful, Enneking has admitted, but his explanation was that he did not wish to be the one to tell Reymore the true reason for her termination namely, her poor performance. He feared she would challenge her termination, which would likely evolve into a "time-consuming and burdensome" process for the school. Def.'s Br. at 12; Enneking Aff. Dep. at 29:12-30:2; 138:7-139:5. Enneking stated that he also sought to spare her feelings, believing she had a better chance of employment elsewhere if she were not required to cite her termination for poor performance as the basis for her departure. *Id.* at 30:9-11; 41:9-17; 139:5-9.

## V.    The Instant Litigation

Reymore filed two charges with the EEOC. The first charge, filed on April 23, 2015, alleged that Marian discriminated against her based on her national origin—Hispanic—and her gender.[3] In the second charge, filed eight and-a-half months later, on

---

[3] Marian, through Enneking, has indicated that the information contained in the EEOC charges was its only indication that Ms. Reymore identified as Hispanic.

January 8, 2015, she alleged that Marian had retaliated against her by not renewing her MAP contract in response to her filing the April EEOC charge.

On January 13, 2016, Reymore filed her Complaint in this court after receiving her right to sue notice from the EEOC on October 19, 2015 (Docket No. 1), which she amended on February 15, 2016. Docket No. 9. On June 14, 2016, the court granted Reymore leave to file a second amended complaint. Docket Nos. 21 and 22. The operative Amended Complaint alleges that, although she "performed her job well" as the interim Dean of the Business School and a tenured professor, she was terminated because of her national origin and her gender and also received less in salary than others due to her gender.[4] Docket No. 23 (Am. Compl.) at 2-3. In support of her gender discrimination claim, Reymore asserts that, as interim dean, she was given only a part-time administrative assistant while the permanent dean, a male, was allowed to hire a full-time assistant. *Id*. at 2. Further, she says, the permanent dean was paid "twice as much" as she was. *Id*. Reymore contends she learned that the male economics professor in the School of Business received a higher salary than she did. *Id*. at 3. The male economics professor was allowed to remain on the School of Business faculty; following Reymore's departure, no tenured or tenure track women professors remained. *Id.* These discriminatory decisions were made by Marian, Reymore alleged, despite the fact that she was more senior and had superior qualifications. *Id.*

---

[4] The parties do not address in their summary judgment briefing Reymore's claim under the Equal Pay Act, 29 U.S.C. § 206(d), so neither do we.

Reymore has acknowledged that the specific reason behind the non-renewal of her full-time faculty contract was the elimination from the curriculum of Marian's economics major and minor degree tracks. Nevertheless, she disputes the legitimacy of this reason citing the fact that although Marian eliminated the art history, photography major and minor, and the French major and minor, Marian renewed the faculty contracts for professors in those departments. *Id.*

Marian filed the summary judgment motion currently before us on January 13, 2017. Docket No. 46. Reymore filed her opposing brief on April 18, 2017. Docket No. 51. Marian filed a reply on March 17, 2017. Docket No. 57. The motion is now fully briefed and ripe for ruling.

## Legal Analysis

### I.     Standard of Review

Summary judgment is appropriate when the record shows that there is "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Disputes concerning material facts are genuine where the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In deciding whether genuine issues of material fact exist, the court construes all facts in a light most favorable to the non-moving party and draws all reasonable inferences in favor of the non-moving party. *See id.* at 255. However, neither the "mere existence of some alleged factual dispute between the parties," *id.*, 477 U.S. at 247, nor the existence of "some metaphysical doubt as to the

material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), will defeat a motion for summary judgment. *Michas v. Health Cost Controls of Ill., Inc.*, 209 F.3d 687, 692 (7th Cir. 2000).

The moving party "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. The party seeking summary judgment on a claim on which the non-moving party bears the burden of proof at trial may discharge its burden by showing an absence of evidence to support the non-moving party's case. *Id.* at 325.

Summary judgment is not a substitute for a trial on the merits, nor is it a vehicle for resolving factual disputes. *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). Therefore, after drawing all reasonable inferences from the facts in favor of the non-movant, if genuine doubts remain and a reasonable fact-finder could find for the party opposing the motion, summary judgment is inappropriate. *See Shields Enterprises, Inc. v. First Chicago Corp.*, 975 F.2d 1290, 1294 (7th Cir. 1992); *Wolf v. City of Fitchburg*, 870 F.2d 1327, 1330 (7th Cir. 1989). But if it is clear that a plaintiff will be unable to satisfy the legal requirements necessary to establish his or her case, summary judgment is not only appropriate, but mandated. *See Celotex*, 477 U.S. at 322; *Ziliak v. AstraZeneca LP*, 324 F.3d 518, 520 (7th Cir. 2003). Further, a failure to prove one essential element "necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323.

A plaintiff's self-serving statements, which are speculative or which lack a foundation of personal knowledge, and which are unsupported by specific concrete facts reflected in the record, cannot preclude summary judgment. *Albiero v. City of Kankakee*, 246 F.3d 927, 933 (7th Cir. 2001); *Stagman v. Ryan*, 176 F.3d 986, 995 (7th Cir. 1999); *Slowiak v. Land O'Lakes, Inc.*, 987 F.2d 1293, 1295 (7th Cir. 1993).

The summary judgment standard is applied rigorously in employment discrimination cases. *Seener v. Northcentral Technical Coll.*, 113 F.3d 750, 757 (7th Cir. 1997); *Wohl v. Spectrum Mfg., Inc.*, 94 F.3d 353, 354 (7th Cir. 1996). To that end, we carefully review affidavits and depositions for circumstantial evidence which, if believed, would demonstrate discrimination. However, the Seventh Circuit has also made clear that employment discrimination cases are not governed by a separate set of rules, and thus remain amenable to disposition by summary judgment so long as there is no genuine dispute as to the material facts. *Giannopoulos v. Brach & Brock Confections, Inc.*, 109 F.3d 406, 410 (7th Cir. 1997).

## II.     Legal Framework for Analyzing Alleged Discrimination and Termination

Reymore's claims for discriminatory termination and retaliation under Title VII invoke the Seventh Circuit's decision in *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760 (7th Cir. 2016). There, the Seventh Circuit addressed the framework by which a plaintiff is allowed two analytical options for proving a claim of discrimination: the "direct" method of proof and the "indirect" method of proof established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). The *Ortiz* Court clarified that all discrimination cases at the summary judgment phase present the same basic legal inquiry:  "whether the

evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the [plaintiff's] discharge or other adverse employment action." *Ortiz*, 834 F.3d at 765. This opinion, however, did not displace the direct and indirect method of proof framework. *Id*. at 766.

Under the direct method, a plaintiff is required to adduce either direct or circumstantial evidence that his employer had a discriminatory motivation in taking the subject action against her. *Collins v. Am. Red. Cross,* 715 F.3d 994, 999 (7th Cir. 2013). Direct evidence is evidence that "should 'prove the particular fact in question without reliance upon inference or presumption.'" *Lim v. Trustees of Ind. Univ.*, 297 F.3d 575, 580 (7th Cir. 2002) (quoting *Markel v. Bd. of Regents of the Univ. of Wisc.*, 276 F.3d 906, 910 (7th Cir. 2002)) (emphasis removed). Stated otherwise, direct evidence is essentially an "admission by the decision maker that the adverse employment action was motivated by discriminatory animus." *Darchak v. City of Chi. Bd. of Educ.*, 580 F.3d 622, 631 (7th Cir. 2009). Of course, if the plaintiff were able to provide direct evidence of discrimination in the workplace, she need not proceed any further, for this evidence alone would prove her claim.

Given that such "smoking-gun" evidence is exceedingly rare, a plaintiff may choose to proceed on the basis of circumstantial evidence which, when viewed as a whole, establishes that she had been discriminated against based on some proscribed factor. *See Good v. Univ. of Chi. Med. Ctr.*, 673 F.3d 670, 675 (7th Cir. 2012) *overruled by Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760 (7th Cir. 2016). Forms of circumstantial evidence include: (1) suspicious timing, ambiguous oral or written

statements, or behavior toward or comments directed at other employees in the protected group; (2) evidence, whether or not rigorously statistical, that similarly situated employees outside the protected class received systematically better treatment; and (3) evidence that the employee was qualified for the job in question but was passed over in favor of a person outside the protected class and the employer's reason is a pretext for discrimination. *Id.* As the Seventh Circuit explained in *Troupe v. May Department Stores Co.*, each type of circumstantial evidence might be sufficient in itself, depending on its strength in relation to the other evidence, or it could be combined with other evidence to "compos[e] a convincing mosaic of discrimination against the plaintiff." 20 F.3d 734, 736–37 (7th Cir. 1994). This approach has become known as "the indirect (or 'mosiac') way of *directly* proving [discrimination]." *Coleman v. Donahoe*, 667 F.3d 835, 862 (7th Cir. 2012) (Wood, J., concurring) (emphasis added).

Alternatively, a plaintiff may seek to prove her claim of discrimination under the so-called indirect method of proof derived from the Supreme Court's analysis in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). Under the indirect method, the plaintiff carries "the initial burden under the statute of establishing a prima facie case of ... discrimination." *McDonnell Douglas,* 411 U.S. at 802. "To establish a prima facie case of discrimination, a plaintiff must offer evidence showing that: '(1) she is a member of a protected class, (2) her job performance met [the employer's] legitimate expectations, (3) she suffered an adverse employment action, and (4) another similarly situated individual who was not in the protected class was treated more favorably than the plaintiff.'" *Coleman*, 667 F.3d at 845 (quoting *Burks v. Wisconsin Dept. of*

*Transportation*, 464 F.3d 744, 750-51 (7th Cir. 2006)). Once a prima facie case is

established, a presumption of discrimination is triggered, shifting the burden "to the

employer to articulate some legitimate, nondiscriminatory reason" for its action.

*McDonnell Douglas,* 411 U.S. at 802. When the employer succeeds in doing so, the

burden shifts back to plaintiff to present evidence to show that the stated reason is a

"pretext," which, if proven, givens rise to an inference of unlawful discrimination. *Id.* at

804.

      Together, the direct method of proof, comprised of its own direct and indirect sub-

methodologies, and the indirect burden-shifting method of proof derived from *McDonnell*

*Douglas*, yielded a labyrinthine system of proving discrimination, one fraught with

"snarls and knots," which eventually has proven to be "too complex, too rigid, and too far

removed from the statutory question of discriminatory causation." *Hitchcock v. Angel*

*Corps., Inc.*, 718 F.3d 733, 737 (7th Cir. 2013).  This was the "state of play" in

employment discrimination litigation until a series of Seventh Circuit opinions was

forthcoming to address these issues and the relative utility of such an "ossified

direct/indirect paradigm." *Id.* (collecting cases).

      Beginning with *Ortiz v. Werner Enterprises, Inc.*, the Seventh Circuit eliminated

the sub-methodologies and analytical divisions of evidence which had developed under

the so-called direct method of proof, replacing that "rat's nest surplus of 'tests'" with a

single issue: "whether the evidence would permit a reasonable factfinder to conclude that

the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge

or other adverse employment action." 834 F.3d at 765, 766. Under this new, "simplified"

approach, the "[e]vidence must be considered as a whole, rather than asking whether any particular piece of evidence proves the case by itself—or whether just the 'direct' evidence does so, or the 'indirect' evidence." *Id.*

Though the *Ortiz* court noted that its decision did "not concern *McDonnell Douglas* or any other burden-shifting framework," *id.* at 766, in the short period of time since that decision, the Seventh Circuit has acknowledged that the straightforward inquiry provided for in *Ortiz* has, indeed, "replaced the notion of two distinct *methods of proof* – the 'direct' and 'indirect." *Harris v. Office of the Chief Judge of the Circuit Court of Cook Cnty.*,673 Fed. Appx.537, 540 (7th Cir. Dec. 13, 2016) (emphasis added). We struggle to reconcile the Seventh Circuit's clear preference for a single, simplified approach in analyzing claims of discrimination with the continued existence and applicability of the Supreme Court's directives in *McDonnell Douglas*. To do so, we shall view *McDonnell Douglas* as simply one pattern – one of many – superimposed on the evidence in an effort to enable a reasonable trier of fact to determine discrimination. *See Knapp v. Evgeros, Inc.*, 205 F. Supp. 3d 946, 958 (N.D. Ill. Sept. 9, 2016). However, our understanding is that a district court need not limit itself to analyzing the evidence only according to the *McDonnell Douglas* template, nor should it be bound by the formulaic foxtrot which has developed under that framework.

**III. Discussion of Reymore's Claims**

**A. Gender-based Discriminatory Termination**

Reymore has alleged that Marian discriminated against her on the basis of her gender when it terminated her full-time faculty contract in 2015.[5] To succeed on this claim, Reymore must establish that: (1) she is a member of a protected class; (2) she was meeting Marian's legitimate performance expectations; (3) she suffered an adverse employment action; and (4) another similarly situated individual not in the protected class or classes was treated more favorably than she was. *See* Coleman, 667 F.3d at 835. The crux of this case relates to the fourth element, to wit, whether any comparators were similarly situated.[6]

**1. Reymore's Sole Comparator is Not Similarly Situated**

Viewed in the light most favorable to Reymore, as we are required to do at this stage of the litigation, the evidence relied upon by her is wholly insufficient to show or to raise the inference that she was terminated from her position because of her gender. The only evidence put forth by Reymore in support of this contention that she was terminated on account of this gender is that she and her former colleague, James Polito, both worked

---

[5] In her complaint, Reymore argues that her termination was illegally based on her Hispanic national origin along with her gender. In her brief, however, she presses only the gender-based discrimination claim. We deem this a waiver of her discrimination claim based on her national origin.

[6] Reymore vigorously argues that she had been meeting Marian University's legitimate expectations (Pl.'s Br. at 28-29), but whether she was in fact meeting Marian's performance expectations is not determinative of her claim. Even if she could establish this element, she is unable to show that a male was similarly situated and was treated more favorably.

under the same supervisory decision maker, Enneking, and both taught economic courses (for a time, both as faculty within Marian's School of Business). The facts before us reveal that Polito, the only named comparator, was not similarly situated to Reymore and therefore his treatment cannot be used to create a genuine issue of fact to prove that her gender was the "but for" or "sole" cause of her termination as a full-time faculty member.

"In order for an individual to be similarly situated to the plaintiff, the plaintiff must show that the individual is 'directly comparable to her in all material respects.'" *Burks v. Wis. Dept. of Transp.*, 464 F.3d 744, 751 (7th Cir. 2006) (citing *Patterson v. Avery Dennison Corp.*, 281 F.3d 676, 680 (7th Cir. 2002)). In general, a Title VII plaintiff must show that her comparators "dealt with the same supervisor, were subject to the same standards and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Gates v. Caterpillar, Inc.*, 513 F.3d 680, 690 (7th Cir. 2008) (internal quotation marks and citations omitted). Essentially, the similarly situated inquiry "is a flexible, common-sense one that asks, at bottom, whether 'there are enough common factors . . . to allow for a meaningful comparison in order to divine whether intentional discrimination was at play.'" *Henry v. Jones*, 507 F.3d 558, 564 (7th Cir. 2007) (citing *Barricks v. Eli Lilly and Co.*, 481 F.3d 556, 560 (7th Cir. 2007).

The evidence reflects that James Polito was not similarly situated to Reymore in a number of respects. First, though Reymore and Polito were both ultimately supervised administratively by Enneking, in truth, all faculty members were supervised by him because he had overall administrative-level responsibility for the academic programs at

Marian. Farther down the ladder, it is clear that Polito and Reymore actually had different direct supervisors and different academic concentrations. As noted above, as part of the 2012 transfer of Marian's Economics Department into the School of Liberal Arts, Dr. Reymore became the sole full-time Marian faculty member in the Economics Department within the Liberal Arts School. She taught in that capacity for the final years of her tenure at Marian and was supervised by the head of that School, Dean Norton. James Polito, who had remained a part of Marian's Business School faculty, was under the supervision of Dean Kershaw. As members of different schools, Reymore and Polito were separately evaluated, subject to separate sets of goals and priorities, and participated in different program initiatives. In addition, Reymore's academic focus was Economics, while Polito's was primarily business and finance. Clearly, these differences prevent them from being regarded as similarly situated for purposes of this litigation.

Marian correctly notes that there are no other valid comparators between the two. As we have indicated, in the fall of 2012 Reymore became the only full-time faculty member within Marian's Economics Department within the School of Liberal Arts, where she remained until the conclusion of the Spring semester in 2015. No full-time faculty members were therefore similarly situated to Reymore. *See Ilhardt v. Sara Lee Corp.*, 118 F.3d 1151, 1155 (7th Cir. 1997) (explaining that a lone part-time employee was not similarly situated to a staff of full-time employees). Reymore's position in the Economics Department of the School of Liberal Arts has not been filled following her departure and, we are informed, is not scheduled to be filled. Reymore's position—and effectively, her department—have been eliminated.

Reymore's failure to satisfy the similarly-situated element of the prima facie test is dispositive of her discrimination claim. However, since Reymore contends that Marian's stated reason for terminating her was pretextual (Pl. Br. at 30-31), we next address Marian's proffered legitimate nondiscriminatory reason for its termination decision.

## 2. Assuming Reymore had established a Prima Facie Case, the Reason for Termination is Not Pretextual

In its summary judgment motion, Marian asserts that Reymore has failed to establish her prima facie case of discrimination, as we have discussed above. Additionally, it argues that even if Reymore had succeeded in proving her gender discrimination claim, the low student enrollment figures explain the basis for their decision, to wit, to delete the economics program and to terminate Reymore's full-time faculty member contract. Reymore insists this reason is pretextual.

A presumption of discrimination is triggered only after a prima facie case is established. Only then does the burden shift "to the employer to articulate some legitimate, nondiscriminatory reason" for its action. *McDonnell Douglas,* 411 U.S. at 802. When the employer does so, the burden shifts back to the plaintiff, who must present evidence that the stated reason is a "pretext," which in turn permits an inference of unlawful discrimination. *Id.* at 804.

To demonstrate pretext a plaintiff must show "such weaknesses, implausibility, inconsistencies, or contradictions in [the employer's] proffered reasons that a reasonable person could find them unworthy of credence and hence infer that [the employer] did not act for the asserted non-discriminatory reasons." *Boumehdi v. Plastag Holdings, LLC*,

489 F.3d 781, 792 (7th Cir. 2007) (internal citation omitted). "In determining whether an employer's stated reason [for discharge] is pretextual, the question is not whether the employer's stated reason was in accurate or unfair, but whether the employer honestly believed the reason it has offered to explain the discharge." *Harper v. C.R. England, Inc.*, 687 F.3d 297, 311 (7th Cir. 2012). "Pretext involves more than just faulty reasoning or mistaken judgment on the part of the employer; it is [a] lie, specifically a phony reason for some action." *Argyropolous v. City of Alton*, 539 F.3d 724, 736 (7th Cir. 2008).

Reymore's contentions and evidence fall well short of satisfying her burden to prove pretext. Reymore argues that the real reason for her termination could not have been the elimination of the economics major and minor. Had that been the case, she says, her colleague, Professor Polito, who taught economics and who has less seniority than she, would have been terminated. Marian's art history, photography, and French professors would have been terminated as well (after the majors and minors in those subjects were also eliminated). Pl.'s Br. at 30. She contends that clearly the true reason for her termination was her gender.

As Marian points out, however, it is undisputed that the economics program suffered from low enrollments, and Reymore herself had voted in favor of eliminating the economics program due to those low student enrollments. Marian was fully justified in eliminating an unsustainable program, for which it would no longer need the services of a full-time faculty member. That Marian's economics program is no longer even in existence bolsters the credibility of Marian's stated reason. *See, e.g. Terrugi v. CIT Group*, 709 F.3d 654, 661 (7th Cir. 2013) (explaining that pretext requires proof that the

24

employer's explanation was a lie). Additionally, Polito was a faculty member affiliated with a different department at Marian than was Reymore and was presenting different courses with a different area of focus. Other professors within the School of Liberal Arts who taught subjects whose majors were also deleted oversaw courses in other departments, which continued to draw sufficient numbers of students to support the continued offering of minors in those subjects. We hold, therefore, that Marian is entitled to summary judgment on Reymore's discriminatory termination claim.

### B. Retaliation

A retaliation claim arises when an employee engages in activity protected by Title VII and suffers an adverse employment action as a result. *See Boston v. U.S. Steel Corp.*, 816 F.3d 455, 464 (7th Cir. 2016). To establish retaliation, a plaintiff must prove:  1) engagement in a statutorily protected activity; 2) a materially adverse action; and 3) a causal connection between the protected activity and adverse employment action. *See Harden v. Marion County Sheriff's Dept.*, 799 F.3d 857, 861-62 (7th Cir. 2015). The dispositive question here is, whether having failed to satisfy the third prong of this test, Reymore's retaliation claim can survive summary judgment. In order to prevail on her retaliation claim, Reymore must be able to adduce "proof that the desire to retaliate was the but-for cause of the challenged employment action." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, —U.S.—, 133 S.Ct. 2517, 2528 (2013). We find that it cannot.

The record before us reveals no evidence of causation between Reymore's filing of her EEOC charge and the termination of her MAP contracts. It was four months after her EEOC filing that Marian decided to discontinue contracting with her for her teaching

services in its MAP program, and eight months until that decision was implemented. This sequence of events does not support a causal connection. *See Povery v. City of Jeffersonville, Ind.*, 697 F.3d 619, 624 (7th Cir. 2012) (the "mere fact that [the defendant] terminated [plaintiff] three weeks after a complaint, by itself, is not sufficient to create a genuine issue of material fact to support a retaliation claim"). Reymore's complete failure to respond to this argument not only strengthens our conclusion of no retaliation but, more significantly, likely constitutes a waiver of the issue.

A Title VII plaintiff may rely on other forms of evidence, such as ambiguous statements, treatment of similarly-situated employees, and any other relevant information giving rise to an inference of retaliation. *See Lambert v. Peri Formworks Sys., Inc.*, 723 F.3d 863, 869 (7th Cir. 2013). Here, Reymore cites several pieces of evidence that she maintains demonstrate the pretextual nature of Marian's reasons for terminating Reymore's MAP contracts. *See Harper v. C.R. England, Inc.*, 687 F.3d 297, 307 (7th Cir. 2012) (holding that a causal connection may be established by showing that an explorer's reasons for the adverse employment action are pretextual).

Reymore first claims that Enneking's reliance on several different reasons for not renewing her contracts permits an inference of retaliation. At different times, he allegedly provided the following explanations for the termination of Reymore's MAP contracts:  he did not know of any reason; she was not a particularly effective or engaging teacher; he believed MAP instructors should have experience outside academia, which she lacked; and she had a history of poor performance. She insists that the true reason for terminating

her MAP contracts was to retaliate against her for filing her earlier EEOC charge alleging illegal discrimination.

But Marian has provided an explanation for Enneking's varied responses, and Reymore acknowledges as much. Enneking apparently did not want to be the one to tell Reymore that Marian was terminating its MAP course contracts with her due to her poor performance. He allegedly anticipated—and was trying to avoid—this lawsuit. Further, he believed her job prospects would be better if she were not aware of the real reason for her termination, which would have required her to disclose that it was due to her poor performance; and Enneking said he did not wish to foster ill-will.

Pretext is defined in this employment discrimination context as something more than a mere mistake or mistaken judgment on the part of the employer; rather, it "means a lie" a "phony reason" for the employment action. *Smith v. Chicago Transit Auth.*, 806 F.3d 900, 905 (7th Cir. 2015). While providing inconsistent reasons for an adverse action may certainly serve as evidence of pretext, in this case, Enneking's reasons for not expressing to Reymore that Marian decided to terminate her MAP contracts due to poor performance were legitimate, that is to say, not a lie. Reymore's theory that Enneking's contradictory statements provide evidence of discriminatory intent better serves her wrongful termination claim than her retaliation claim, but in either instance it falls well short of proving pretext.

Nor do any other facts offered up by Reymore support an inference of retaliatory intent. Reymore has argued as follows: 1) she was asked to revise one of the MAP courses in 2015; 2) her contract to teach online MAP courses was renewed 27 times since

2010; 3) Laura Moore, who eventually replaced Reymore, also received negative evaluations by students; and 4) it was Enneking, rather than Neff (the person who typically made MAP contract renewal recommendations), who decided not to renew Reymore's MAP contracts. These facts and evidence as a whole, according to Reymore, would permit a fact-finder to conclude that her MAP contracts were not renewed because she had filed a discrimination charge with the EEOC against Marian. Marian's specific factual refutations of each of these issues successfully defeat Reymore's claim of retaliation, as we discuss below in greater detail.

Marian explains that the "textbook revision" that Reymore was hired to perform for a MAP course in March 2015 was in major respects a clerical task requiring an adjustment of the course syllabus and materials to correspond with a new textbook or a new edition of a textbook. Def.'s Br. at 34. Having been hired to perform this task does not reflect any particular confidence in the assigned instructor, nor is it inconsistent with Marian's decision made four months later to discontinue its contract relationship with her to provide MAP course instruction.

The fact that before it was terminated Reymore's contract to teach MAP courses was renewed more than two dozen times does not necessarily show discriminatory retaliation, especially in light of the evidence establishing that over several semesters Enneking monitored Dr. Reymore's performance in MAP courses and, after receiving negative feedback from students and observing that Dr. Reymore was still failing to meet informant deadlines, he simply decided to discontinue entering into contracts with her.

Reymore cites the fact that both she and Moore had received negative feedback from MAP students, but only she filed an EEOC charge. While true, this difference does not establish a causal link between Marian's MAP contract termination and a retaliatory intent. Indeed, Reymore explains that the students' criticisms of Moore were based on allegedly ineffective communications. This does not establish or prove that Moore had a long history of poor performance, which was the motivating cause of Reymore's termination.

It was Enneking, rather than Neff, who decided to end Marian's MAP course contract with Reymore, but the evidence shows that Neff herself had observed a decline in Reymore's work ethic, passion, and energy as a MAP instructor during Reymore's final two years of teaching, thereby justifying Neff's failure to voice any disagreement with Enneking's decision to terminate the contract. Reymore's retaliation claim fails for lack of evidentiary support, including the lack of a causal connection between her protected activity and the contract termination.

## IV. Conclusion

For the foregoing reasons, Defendant's Motion for Summary Judgment is GRANTED. Final judgment shall issue accordingly.

IT IS SO ORDERED.


Date: _____9/29/2017_____

_Sarah Evans Barker_____
SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Distribution:

Amber Boyd at amber@amberboydlaw.com

Germaine Winnick Willet at germaine.willet@icemiller.com